**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TEAMSTERS LOCAL UNION NO. 727** | ) | |
| **HEALTH AND WELFARE FUND, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 14 C 9813** |
| | ) | |
| **DE LA TORRE FUNERAL HOME &** | ) | |
| **CREMATION SERVICES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Teamsters Local Union No. 727's Health and Welfare Fund, Pension Fund, and Legal and Educational Assistance Fund (collectively, "the Fund") filed this action against De La Torre Funeral Home & Cremation Services, Inc. (De La Torre) under sections 502 and 515 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1132, 1145. The Fund alleges that De La Torre failed to make contributions as outlined in the collective bargaining agreement (CBA) that it signed with Teamsters Local Union No. 727 (Local 727). The Fund seeks to recover unpaid contributions from De La Torre, as well as interest, liquidated damages, attorney's fees and costs. The Court previously granted summary judgment on the Fund's behalf but later vacated that judgment after the filing of a motion under Federal Rule of Civil Procedure 60(b). The Fund has now moved for summary judgment for the second time. For the following reasons, the Court grants the Fund's motion.

**Background**

The Court takes the following facts from its prior rulings, as well as the parties' materials filed in connection with this motion for summary judgment. Any genuine dispute of fact is resolved in favor of the non-moving party—De La Torre.

**1.     De La Torre**

De La Torre is a family-run funeral home and corporation. Pls.' Stat. of Material Facts, Ex. (Pls.' Ex.) 3 (Eulalio Dep.) at 12:13-15. De La Torre is operated by Eulalio De La Torre, his son, Edward, and his daughter, Violeta. *Id.* at 9:21-10:1. Prior to 2010, Eulalio was the sole owner of De La Torre. *See* Pls.' Ex. 1G (Audit) at 23813. Eulalio testified that sometime in 2010, he gave Edward and Violeta twenty percent ownership in De La Torre each. *Id.* at 238:13-15.

Eulalio, Edward, and Violeta have defined positions at De La Torre, but their roles appear to be somewhat flexible based on De La Torre 's need at any point in time. For example, Eulalio is De La Torre 's funeral director, but he also drives a hearse and "make[s] removals." Eulalio Dep. at 8:21-9:1. Edward mainly performs janitorial services for the funeral home, but he also assists his father with body removals (approximately fifty removals a year). Pls.' Ex. 4 (Edward Dep.) at 5:2-6:9. Violeta is a funeral director at De La Torre, but she also regularly removes bodies and, "[e]very once in awhile," performs embalming services. Pls.' Ex. 5 (Violeta Dep.) at 4:19-5:4, 7:21, 8:4-7. Violeta is a licensed funeral director and embalmer. *See* Eulalio Dep. at 10:22-11:4, 16:18-20; Violeta Dep. at 7:18-19. Aside from family members, De La Torre has one other employee, a licensed embalmer that it hires when the funeral home is especially busy. *See* Violeta Dep. at 9:14-10:2; Eulalio Dep. at 10:2-21.

## 2. Eulalio's meeting with a Local 727 representative

Prior to opening De La Torre, Eulalio was an employee of another funeral home. While working for that funeral home, Eulalio received health insurance coverage through Local 727. Eulalio Dep. at 24:5-24. After opening De La Torre, Eulalio visited the Local 727's office to explore the option of continuing his health insurance plan. *Id.* Eulalio informed a person he identified during his deposition as a Local 727 agent named either "Bob" or "Scott" that he wanted to continue his health insurance with Local 727 but that he could not afford the non-health insurance fees, such as payments to the pension plan. *Id.* at 22:9-23:2. Eulalio testified that he was told by a Local 727 representative that if he signed a CBA with Local 727, he would be able to keep his health insurance and would not have to pay into the union's pension fund. *Id.* at 24:5-12. Eulalio testified that the representative also told him that he would not have to make contributions on behalf of himself or his children because the CBA provides an exemption where an employee is an owner of a funeral home. *Id.* Eulalio testified that although he did not fully understand the agreement, he signed the CBA based on the statements by the union's representative. *Id.* at 25:12-15.

## 3. The Local 727 CBA

On March 28, 2011, De La Torre signed a compliance agreement with Local 727, which bound it to a CBA with Local 727, an affiliate of the International Brotherhood of Teamsters (IBT). Pls.' Ex. 1D (Compliance Agreement) at 23997; Pls.' Ex. 1E (CBA) at 23821.

The compliance agreement that Eulalio signed states that De La Torre agreed to become a party to, and to be bound by the terms in, the following contracts:

3

> (a) The Restated Agreement and Declaration of Trust and all
> present and subsequent amendments thereto of the Teamsters Local
> Union No. 727, I.B. of T Health and Welfare Fund;
> (b) The Restated Agreement and Declaration of Trust and all
> present and subsequent amendments thereto of the Teamsters Local
> Union No. 727, I.B. of T Pension Fund;
> (c) The Restated Agreement and Declaration of Trust and all
> present and subsequent amendments thereto of the Teamsters Local
> Union No. 727, I.B. of T Legal and Educational Assistance Fund[.].

Compliance Agreement ¶ 2. The compliance agreement also states that "the [e]mployer agrees to make payments covering all employees represented by Local Union No. 727 . . . to said Plans as required by the Principal Agreement, extensions and renewals thereof, and any modifications or amendments thereto, and the Amended Agreements and Declarations of Trust of the aforesaid Plans." *Id.*

Following its execution, the compliance agreement was in full effect until June 30, 2012 and then from year to year after that point. *Id.* ¶ 3. Over time, De La Torre was subject to two CBAs. The first covered the period from July 1, 2007 to June 30, 2012, and the second covered the period from July 1, 2012 to June 30, 2017. Pls.' Exs. 1E & 1F. The Court will refer to the two CBAs collectively as "the CBA."

The CBA imposes on the employer the obligation to make monthly contributions on behalf of covered employees to the Health and Welfare, Pension, and Legal and Educational Assistance funds. *See* CBA, Art. 10, §§ 10.1-10.3. Specifically, the employer is required to make these contributions on behalf of employees who perform the following tasks: "removals, transportation of remains, embalming, funeral directing[,] and all other work historically done by the bargaining unit." *Id.*, Art. 1, § 1.1.

According to the CBA, an employer is exempt from making these contributions on behalf an employee who is a funeral home owner, subject to the following terms:

**EXEMPTION FOR FUNERAL HOME OWNERS**.  It is agreed that the provisions of Section 10.1, 10.2, and 10.3 may not apply to individuals who qualify as an owner of a funeral home(s) under the terms herein provided in this Section 10.6.  An owner of a funeral home is defined as an individual who directly owns ten percent (10%) or more of a funeral home(s).  In the case of a corporation which owns a funeral home, such individual must directly own ten percent (10%) or more of the total voting power of all classes of stock entitled to vote, provided that said stock was purchased at market value or inherited and not given or purchased for the purpose of eliminating the contractual obligation to contribute to the Health and Welfare, Pension and Legal and Educational Assistance Funds.  []  The exemption provided for in this Section 10.6 explicitly excludes Livery and Removal Services.

*Id.*, Art. 10, § 10.6.

In the event that an employer fails to make payments for non-exempt employees,

the CBA establishes a process for the Fund to collect delinquent payments:

**DELINQUENT PAYMENTS**.  It is agreed that in the event any Employer is delinquent in the payment of its contribution to the Health and Welfare, Pension and Legal and Educational Assistance Funds, in accordance with the rules and regulations of the Trustees of such Funds, the Trustees may require the payment as liquidated damages of an amount not to exceed twenty percent (20%) of the delinquent payment or fifty dollars ($50.00) whichever is greater.  It is agreed that in the event of an such delinquency, the Employer shall be responsible to the employee for losses resulting therefrom.  In the event the Trustees of the Funds are required to retain legal counsel and/or accountants to collect delinquent payments to the Funds, the Employer shall be responsible for the payment of the legal fees, accountant fees and court costs if it is determined that the Employer was delinquent.

*Id.*, Art. 10, § 10.10.

**4.    Audit**

The Fund, through the accounting firm Bansley and Kiener, L.L.P., performed a

payroll audit on De La Torre for the periods of November 1, 2011 to April 30, 2014.  Pls.'

Ex. 2 (Regan Aff.) ¶¶ 3-4.  The auditor found that De La Torre was making the required

Fund payments on behalf of Eulalio but had failed to remit contributions for Violeta and

Edward. Audit at 23812. Specifically, the auditor found that "full contributions were not remitted for [funeral] directing completed by Violetta [sic] [ ] or removals completed by Edward [ ]." *Id.* at 23811. The auditor ultimately concluded that, as of May 29, 2014, De La Torre owed to the Fund $77,899.32 in delinquent payments, liquidated damages, interest, and audit fees. *Id.* at 23796. Breaking that number down further, the auditor found that De La Torre owed $32,527.65 to the Health and Welfare Fund, $42,580.26 to the Pension Fund, and $2,791.41 to the Legal and Education Assistance Fund. *Id.*

The auditor also reported to the Fund that during his review of De La Torre, Eulalio told him that he was not required to make payments on behalf of Violeta and Edward because they were owners of the funeral home. *Id.* at 23812. On July 15, 2014, in response to the auditor's preliminary report, Eulalio submitted an affidavit stating that Violeta and Edward had been owners of De La Torre since at least July 2010. *Id.* Notwithstanding Eulalio's affidavit, the auditor reported that "[b]ased on the dates noted in the affidavit [the] concerns noted within [the] report remain." *Id.* The auditor was referring to the fact that the affidavit was dated July 1, 2010 and purportedly was notarized on that same date, but it referred to events in June 2014. *Id.* The affidavit read as follows:

> I, EULALIO DE LA TORRE, sole owner of [De La Torre] do hereby state that as of *June 11, 2014* I have awarded the shares of stock in said corporation as follows:
>
> TO: EDWARD DE LA TORRE, my son, 20% of the total amount of the outstanding shares owned by me; and
>
> TO: VIOLETA D. DE LA TORRE, my daughter, 20% of the total amount of the outstanding shares owned by me.
>
> The remaining 60% of the shares in said corporation remain owned by myself.

*Id.* at 23813 (emphasis added).

Ultimately, De La Torre refused to make the allegedly delinquent payments to the Fund.

**5.      Procedural history**

On December 8, 2014, the Fund filed suit against De La Torre, seeking payment of delinquent contributions, interest, liquidated damages, attorney's fees and costs.

**a.      The prior judgment**

At the outset of this lawsuit, De La Torre was represented by attorney James Augustyn.  De La Torre filed an answer to the Fund's complaint in which it denied that it employed persons who are represented by Local 727 or who are bound by any CBA.  At the close of discovery, the Fund moved for summary judgment.  Augustyn did not file a response.  On October 19, 2015, the Court granted summary judgment for the Fund and ordered De La Torre to pay the Fund $95,753.63 in delinquent payments, liquidated damages, interest, and attorney's fees.  *See* dkt. no. 32.

In order to collect on the judgment, the Fund served citations to discover assets on both De La Torre and Eulalio.  Upon receipt of these citations, De La Torre retained new counsel to represented both the company and Eulalio individually.  Through new counsel, De La Torre moved to vacate the judgment and quash the citations.  It argued that Augustyn had abandoned his representation of De La Torre and that the company should not be denied the opportunity to defend itself on the merits due to its attorney's default.  It contended that it had a viable defense to the Fund's claims.  On February 20, 2016, the Court entered an order stating that it would grant De La Torre's motions to vacate the judgment and quash the citations if, but only if, De La Torre paid $3,000 to

the Fund for the reasonable attorney's fees the Fund had incurred in moving for summary judgment. De La Torre met this condition, and the Court vacated the judgment on March 3, 2016. *See* dkt. no. 51.

### b. De La Torre's amended affirmative defenses

After the Court vacated the judgment, De La Torre made an oral motion to amend its affirmative defenses to assert that an agent of the Fund made misrepresentations to Eulalio that induced him to sign the compliance agreement that bound De La Torre to the Local 727 CBA. This Court found that although De La Torre's request to amend its affirmative defenses was untimely, it had shown good cause to amend. *See* dkt. no. 67 at 1. This Court noted that if De La Torre were permitted to add the new defense, the only prejudice to the Fund would be the potential need to retake Eulalio's deposition. To remedy this, the Court directed De La Torre to pay the Fund for its reasonable attorney's fees and expenses incurred in taking Eulalio's original deposition. *See id.* at 1-3. De La Torre ultimately paid the $6,600.00, and the Court then granted its motion to amend its affirmative defenses. *See* dkt. no. 79.

De La Torre then filed its amended affirmative defenses. It asserted that the Fund's claim is barred under the doctrine of promissory estoppel and due to negligent misrepresentation and intentional misrepresentation. De La Torre made the same allegations to support each of its defenses. It alleged: 1) the Fund is "in the business of supplying information for the guidance of an Employer's business [] regarding the obligations of an Employer [] to pay contributions to" the Fund; 2) "[Bob] MacArthur[1] represented to Eulalio on or about March 28, 2011, and on prior occasions over the

---

[1] MacArthur is a collection and field representative for the Fund.

telephone, that if Eulalio signed a collective bargaining agreement on [De La Torre's] behalf, [De La Torre] would not be required to pay contributions and/or dues to [the Fund] or Eulalio's family members, which includes his children, who are part of the family business," and 3) based on MacArthur's false representations, Eulalio signed the compliance agreement and did not make any contributions to the Fund on behalf of Edward or Violeta. *See* dkt. no. 90 ¶ 2.

      **c.**    **Depositions**

On October 17, 2016, the Court permitted De La Torre to take the deposition of Bob MacArthur. Eulalio De La Torre was present at the deposition. Eulalio says that he realized at the deposition that he had never seen or met with MacArthur. Def.'s Ex. A (Eulalio Decl.) ¶ 5. He stated that he determined that he had actually met with Ben Affetto at the Fund's office when he signed the Compliance Agreement. Affetto is a collection and field representative (CFR) for the Fund who works on the same floor as MacArthur. *Id.* ¶ 6. The Court allowed De La Torre to take Affetto's deposition.

Affetto testified during his deposition, taken on February 22, 2017, regarding his dealings (or lack thereof) with Eulalio and De La Torre, the Fund's role in working with new employers, and the Fund's relationship to Local 727. Affetto testified that he did not recognize Eulalio (who attended the deposition) and that he did not believe he had ever met Eulalio prior to the deposition but that he could not say "for certain." Pls.' Ex. 6 (Affetto Dep.) at 8:12-21. Affetto did say, however, that he knew of Eulalio from his dealings with Eulalio's prior employer. *Id.* at 8:1-11. On the topic of the Fund's involvement with new employers, Affetto testified that "we [CFRs] introduce ourselves to [new employers] when we can, and make ourselves available to go over the remittance

process and the various policies." *Id.* at 11:11-13. He stated that "[a]ny contributing employer is introduced [by its assigned CFR] to the proper procedures to remit contributions." *Id.* at 11:16-17. Affetto testified that Scott Johnson was the CFR currently assigned to De La Torre but that he did not know whether Johnson had always been assigned to De La Torre. *Id.* at 11:22-12:5. Finally, Affetto was asked whether he had ever been involved in signing up "new contributing employers" (the questioner did not specify what type of documents he was referencing). *Id.* at 16:5-6, 8-9. Affetto said, "[t]hat's a tough question to answer. I'm just -- I'm not sure how to answer it." *Id.* at 16:10-11. When asked whether, as a CFR, he had "documents that a new employer can sign," Affetto replied that "[t]he only documents we require an employer to sign would be the remittance reports. I'm not involved with the signing of the contract." *Id.* at 16:14-16. When asked whether he had compliance agreement forms for employers to fill out if they want to sign up with the union, Affetto stated that, "[a]s a function of the Union, we don't have – I'm not aware that we have those forms." *Id.* at 17:7-11.

On March 2, 2017, De La Torre amended its affirmative defenses again so that all references to "MacArthur" were replaced with "Affetto." De La Torre did not take the deposition of Scott Johnson.

### d.    Present motion for summary judgment

On April 6, 2017, the Fund filed the present motion for summary judgment. It argues that De La Torre has no viable defense against the Fund's claims for recovery of delinquent payments. First, the Fund argues that the doctrine of promissory estoppel cannot be asserted by De La Torre because this legal doctrine is not available to an employer bound by a multi-employer collective bargaining agreement. Second, the

Fund argues that, even if De La Torre could assert an estoppel defense, De La Torre cannot prevail because it cannot show that the Fund made a misrepresentation in writing—a necessary element of an estoppel claim in the ERISA context. Third, the Fund argues that if, by asserting a promissory estoppel defense, De La Torre actually meant to assert a fraud in the inducement or a fraud in the execution defense, neither defense is available to De La Torre. The Fund contends that a defense of fraud in the inducement is not permitted in ERISA cases and that a defense of fraud in the execution is not available because Eulalio testified that he read the CBA.

In its reply, the Fund asks the Court to strike the declarations by Eulalio, Edward, and Violeta filed by De La Torre. The Fund argues that each declaration directly contradicts the particular witness's prior deposition testimony.

### Discussion

Summary judgment is appropriate where "there is no genuine issue of material fact and the [movant] is entitled to judgment as a matter of law." *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 730 (7th Cir. 1996). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In determining whether a genuine issue of material fact exists, [a court] draw[s] all reasonable factual inferences in favor of the non-movant." *Downs v. World Color Press*, 214 F.3d 802, 805 (7th Cir. 2000).

### A.      The De La Torres' affidavits

As an initial matter, the Court will address the Fund's arguments that Eulalio, Edward, and Violeta's declarations contradict prior testimony and should be stricken.

A court may disregard an affidavit that conflicts with the affiant's previous deposition testimony under what is sometimes called the "sham affidavit rule." A "sham" affidavit involves "contradictions so clear that the only reasonable inference was that the affidavit was a sham designed to thwart the purposes of summary judgment." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015). This rule is applied with "great caution," as so not to usurp the fact finder's role in making credibility determinations. *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016). "Changes in testimony normally affect the witness's credibility rather than the admissibility of the testimony, and thus the sham-affidavit rule applies only when a change in testimony is incredible and unexplained, not when the change is plausible and the party offers a suitable explanation such as confusion, mistake, or lapse in memory." *Id.* (internal quotation marks omitted).

### 1. Scope of Violeta's work

On March 17, 2015, Eulalio and Violeta had their depositions taken. Eulalio testified that Violeta is a licensed funeral director, Eulalio Dep. at 11:1-4, and when asked whether she does embalming, Eulalio answered with an unqualified "[y]es." *Id.* at 16:9-20. Similarly, when asked whether she is an embalmer, Violeta testified, "I am." Violeta Dep. at 7:18-19. Asked whether she does embalming at the funeral home, Violeta testified, "Every once in a while, yeah." *Id.* at 7:20-21. Eulalio and Violeta also testified that De La Torre had another licensed embalmer on staff. When asked why the funeral home had two embalmers, Violeta said that she and the other licensed embalmer would never work on the same body and that De La Torre would call in the other embalmer "if we're like busy as far as like with other families. If I'm busy, then we

would call him in."  Violeta Dep. at 9:19-10:2.

In their declarations submitted in opposition to the Fund's current motion for summary judgment, Eulalio and Violeta say the opposite.  In his declaration dated May 15, 2017, submitted after the Fund filed its second motion for summary judgment, Eulalio stated:  "In my deposition, I said that Violeta does embalming.  When I made this statement, I was referring to the fact that Violeta puts makeup on bodies."  Eulalio Decl. ¶ 9.  In her February 18, 2016 declaration, Violeta stated:  "In my deposition, I said that I embalm every once in awhile.  When I made this statement, I was referring to the fact that I put makeup on [bodies] . . . ."  Def.'s Ex. C (Violeta Decl.) ¶ 6.  Violeta further stated in her declaration that, "[w]hen I was busy meeting with families and did not have time to put makeup on bodies, I called [the embalmer on staff] for help so that he could come and apply makeup on the bodies" and that "I have not engaged in the art of embalming since the year I was licensed in or about 2002."  *Id.*  Finally, Edward stated in his declaration, dated May 15, 2017, that "[m]y sister, Violeta [,] did not engage in any embalming during the period, in whole or in part, from November 1, 2011 through April 2014."  Def.'s Ex. B (Edward Decl.) ¶ 2.

The declarations by Eulalio and Violeta do not explain or clarify their earlier sworn deposition testimony; they flatly contradict it.  Both were asked directly whether Violeta did embalming, and both answered with an unequivocal yes.  And Violeta elaborated on this testimony by stating that she and the other embalmer did not work on the same bodies, as quoted earlier.  Both Eulalio and Violeta have worked during the entirety of their adult lives in the funeral home business, and both are licensed funeral directors.  And neither of them expressed any confusion or doubt about what the

questioner meant by the term "embalming."  It defies credulity for either of them to claim

long after the fact that they confused putting makeup on a corpse with embalming,

particularly when they also say in their declarations that the two processes are separate

and distinct.  *See* Eulalio Decl. ¶ 9; Violeta Decl. ¶ 6.  Neither of them makes any

attempt to explain how they possibly could have been confused or mistaken.  Applying

the sham affidavit rule, the Court strikes these contradictory statements from the

declarations of Eulalio and Violeta.  The Court also strikes the parallel statement from

the declaration of Edward.  De La Torre cannot use his declaration to end-run either the

testimony of those with direct knowledge (Eulalio and Violeta) or the sham affidavit rule.

### 2.      Eulalio's meeting with the Fund

With regards to the discrepancies found in Eulalio's story about meeting with a

representative of the Fund, the Court cannot say definitively that Eulalio's declaration

directly contradicts his prior testimony.  The Court therefore declines to strike Eulalio's

May 15, 2017 declaration as it relates to this meeting.

Eulalio's testimony about his meeting with the Fund has evolved over the course

of this litigation.  That said, the outline of his story has remained consistent—someone

represented to him that if he signed a compliance agreement binding De La Torre to

Local 727's CBA, he could get health coverage for himself, but De La Torre would not

have to make Fund contributions on behalf of Edward or Violeta.  Before the Fund filed

this suit, Eulalio admitted to the Fund's auditor that De La Torre did not make

contributions on behalf of either Edward or Violeta but stated he believed De La Torre

was not required to do so, as they were part owners of the funeral home.  Likewise, in

De La Torre's original answer to the Fund's complaint, it denied that it has ever

employed persons who are represented by Local 727 or who were bound by any collective bargaining agreements.

Eulalio has, at different times, given the names of at least three different persons who made the alleged representations regarding Edward and Violeta. Each of the persons identified is a representative of the Fund. During his first deposition, Eulalio testified that he met with either "Bob" or "Scott." Then, after realizing he had never met Bob MacArthur, Eulalio said that he met with Ben Affetto and that he spoke to "Scott" at some point after signing the CBA. Assuming "Scott" is Scott Johnson, all three of the individuals that Eulalio named worked for the Fund, not Local 727. Bob MacArthur was a CFR for the Fund, as was Ben Affetto. And Scott Johnson was a CFR who was assigned to De La Torre. All three of them had offices on the same floor.

Eulalio's changing versions of the events could lead a reasonable fact finder to discredit his claims. On the other hand, a reasonable fact finder could believe his current version, namely that he met with Affetto, a Fund representative, who said that if Eulalio signed a compliance agreement binding De La Torre to Local 727, he would not have to make contributions of behalf of his children, Edward and Violeta. Eulalio's declaration does not directly contradict his prior testimony, so the Court declines to strike it.

**B.    ERISA**

Section 515 of ERISA states that an employer must contribute to an ERISA-governed fund if the employer signs onto a CBA that mandates contributions to such a fund. *Illinois Conference of Teamsters & Empl'r Welfare Fund v. Mrowicki*, 44 F.3d 451, 458 (7th Cir. 1994) ("Section 515 of ERISA, 29 U.S.C. § 1145, provides that when an

employer agrees to contribute to a multiemployer pension or welfare plan pursuant to the terms of the plan or to the terms of a collective bargaining agreement, that agreement is enforceable to the extent not inconsistent with the law.").  Where a union and an employer sign a CBA establishing a pension or other ERISA-governed trust fund, the fund's trust or trustees are entitled to enforce the relevant provisions of the CBA against an employer that has failed to make contributions to the fund.  *See Kroger Co.*, 73 F.3d at 731 ("Section 515 gives pension funds [] the right to enforce the writings according to their terms.") (internal quotation marks omitted).

The Fund seeks to require De La Torre to make delinquent payments for Edward and Violeta and to pay liquidated damages and attorney's fees, accountant fees, and legal costs.  *See* CBA, Art. 10, § 10.10.  The Court overrules De La Torre's contention that the Fund is not entitled to recover because it suffered no "damages."  This argument is not supported by any authority under ERISA, and in any event the Fund's losses are the unpaid contributions that De La Torre agreed to pay.  The Court also overrules De La Torre's contention that their liability should be extinguished or cut because Violeta's covered work was minimal; they cite no authority to support this contention either.

The Court therefore turns to De La Torres' defenses.   They assert as defenses promissory estoppel, fraud in the inducement, fraud in the execution, and negligent misrepresentation.

### 1.    Promissory estoppel

De La Torre argues that the Fund's claim should be denied based on a theory of promissory estoppel.  It contends that application of promissory estoppel is appropriate

because otherwise the Fund would benefit from its own wrongdoing, namely, making false statements to Eulalio to induce him to sign a compliance agreement that was unfavorable to him.

Under federal common law, "promissory estoppel in the ERISA context requires [a party] to demonstrate that he has relied to his detriment on a promise and that his reliance was reasonable." *Shields v. Local 705, Int'l Bhd. of Teamsters Pension Plan*, 188 F.3d 895, 901 (7th Cir. 1999). "Although the definition and elements of 'estoppel' in the ERISA context have been varied, [ ] four elements must always be present: (1) a knowing representation, (2) made in writing, (3) with reasonable reliance on that misrepresentation by the plaintiff, (4) to her detriment." *Trustmark Life Ins. Co. v. Univ. of Chicago Hosps.*, 207 F.3d 876, 883 (7th Cir. 2000). When all such elements are present, the "promise will be enforced in order to avoid injustice." *Id.*

This defense founders on the requirement of a *written* representation; De La Torre does not allege one. Rather, De La Torre contends that the Fund agent made oral misrepresentations. The Seventh Circuit has made it clear that equitable principles "cannot override the rule forbidding oral modifications to ERISA plans." *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 585 (7th Cir. 1999). In addition, De La Torre cannot show that Affetto's oral representations were false. Affetto is alleged to have told Eulalio about a CBA exemption for employees who are funeral home owners. But Local 727's CBA *does* include such an exemption. The Court discusses this topic in further detail in the following section.

### 2. Fraud in the inducement

The parties discussed promissory estoppel and fraud in the inducement

interchangeably, so the Court will also address the issue of fraud in the inducement.

Fraud in the inducement "occurs when fraud induces a party to assent to a commitment that the party understands but to which the party would not otherwise have assented; the promisor knows what it is signing but its assent is induced by fraud." *Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 779 (7th Cir. 2002) (internal quotation marks omitted).  The Seventh Circuit has stated that section 515 of ERISA, under which the Fund brings this suit, "clearly forecloses the defense of fraud in the inducement."  *Id.*

Most of the situations in which this defense is interposed involve representations by a union representative, rather than a representative of the ERISA-governed fund.  An argument could be made that the defense should be available where the representations underlying the defense were made by a fund representative.  But De La Torre has not provided evidence from which a reasonable fact finder could find that a representative of the Fund made a misrepresentation.  The Fund's agent allegedly told Eulalio that De La Torre did not have to make contributions on behalf of his children because there is an exemption from contributions for owners.  Assuming this was said, it was true.  The CBA states that Fund contributions "may not apply to individuals who qualify as an owner of a funeral home(s)."  CBA, Art. 10, § 10.  The CBA defines a funeral owner as "an individual who directly owns ten percent (10%) or more of a funeral home(s)."  *Id.*  The CBA also says that this exemption does not apply where an individual's ownership interest "was not given or purchased for the purpose of eliminating the contractual obligation to contribute" to the Fund.  *Id.*  Evidently, in Eulalio's telling, this exception to the ownership exemption was not discussed by the

Fund representative, but that does not make what the representative allegedly said about the ownership exemption untrue. The Court also notes that De La Torre advances no argument that the ownership exemption applies here. *See* Def.'s Resp. at 10.

The Court concludes that no reasonable fact finder could find in De La Torre's favor on a fraud in the inducement defense assuming one is available

### 3. Fraud in the execution

De La Torre next argues that the Fund's claim is barred due to intentional misrepresentations by a Fund representative. The discussion in the parties' briefs indicates that De La Torre intends by this to argue a defense of fraud in the execution.

Unlike fraud in the inducement defense, a party may assert a fraud in the execution defense against a claim by an ERISA-governed fund. *A & C Envtl.,* 301 F.3d at 780. "Because an employer's assent procured by fraud in the execution renders the agreement void[,] section 515 does not foreclose the defense of fraud in the execution to actions by pension funds to collect delinquent contributions." *Id.*

To successfully assert a fraud in the execution defense, a party must prove "that it did not know that it was signing a collective bargaining agreement that obligated it to make contributions to the Funds and that its ignorance was excusable because it had reasonably relied upon the representations of the union representative." *Id.* In *A & C Environmental*, the Seventh Circuit rejected the defendant's fraud in the execution defense. *Id.* Although the fund admitted that an agent of the union had misrepresented the terms in the CBA to the defendant, the court found that it was unreasonable for the defendant to have relied on the misrepresentation because it could have read the

agreement and discovered the truth.  *Id.* at 781.  The court concluded that, "in short, [the defendant's] ignorance of the nature of the contract was not excusable."  *Id.*

Here, it is undisputed that Eulalio knew he was signing onto a CBA and that he read the compliance agreement.  The compliance agreement stated that "the Employer agrees to make payments covering all employees represented by Local Union No. 727, I. B. of T. to said Plans as required by the Principal Agreement, extensions and renewals thereof, and any modifications or amendments thereto . . . ."  Compliance Agreement § 2.  During his deposition, Eulalio testified he did not understand the agreement but simply relied on what the Fund representative had told him.  *See* Eulalio Dep. at 25:11-15.  But that is insufficient to give rise to a fraud in the execution defense; Eulalio plainly was aware that he was signing an agreement that obligated him to comply with a CBA that required contributions to various funds.  His claimed ignorance about specific terms *within* the agreement is not a basis for a fraud in the execution defense.

### 4.     Negligent misrepresentation

Finally, De La Torre asserts the defense of negligent misrepresentation.  Without conducting a preemption analysis, the Court finds that De La Torre's negligent misrepresentation claim fails for the same reasons discussed with regard to his fraud in the inducement defense:  no reasonable fact finder could find that the Fund's alleged representations were false.

### Conclusion

For the foregoing reasons, the Court grants plaintiffs' motion for summary judgment [dkt. no. # 113].  Plaintiffs are directed to provide defendants with a proposed

judgment order by August 17, 2017, and the parties are to provide an agreed upon form

of judgment order (or alternative proposals in the event of non-agreement) to the Court

by August 21, 2017.  The case is set for a status hearing on August 23, 2017 at 9:30

a.m. for the purpose of entering a final judgment and setting a schedule for

determination of plaintiffs' recoverable attorney's fees.

_____
MATTHEW F. KENNELLY

Date:  August 14, 2017                         United States District Judge